**Glenna A. BASKIN, et al., Appellants,**

v.

**MORTGAGE AND TRUST, INC. and MDC/Wood, Inc. Formerly Known as Wood Bros. Homes, Inc., Appellees.**

No. A14–91–01048–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 13, 1992.

Rehearing Denied Sept. 10, 1992.

David W. Showalter, Pamela P. Stines, Daniel C. Conley, Bellaire, for appellants.

Steve Stewart, Linda M. Cipriani, Houston, Hardin Ramey, Dallas, for appellees.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is an appeal from summary judgments granted in favor of a homebuilder

and a lender involved in a subdivision developed on property allegedly traversed by an active geological surface fault. Appellants, forty-one individuals who own property and/or reside in the subdivision, alleged misrepresentation, concealment, fraud, negligence, breach of warranty, conspiracy, and violations of the Texas Deceptive Trade Practices Act. The homebuilder, MDC/Wood, Inc. formerly known as Wood Bros. Homes, Inc. ("Wood Bros."), based its motion for summary judgment in part on Tex.Civ.Prac. & Rem.Code Ann. § 16.009 (Vernon 1986), a ten-year statute of repose.[1] Wood Bros. also filed a counterclaim pursuant to Tex.Bus. & Com.Code Ann. § 17.50(c) and Tex.R.Civ.P. 13 and 215(2)(b). The lender, Mortgage and Trust, Inc. ("M & T"), also counterclaimed pursuant to Section 17.50(c), and it filed a motion for summary judgment asserting that it was not an owner, partner, or joint venturer in the subdivision and had made no representations to appellants in connection with their homes. The trial court granted appellees' motions for summary judgment and their joint motion for non-suit regarding their counterclaims. Appellants contend the trial court erred in granting the summary judgments and in refusing to grant their objections to certain summary judgment evidence. We affirm.

Wood Bros. developed Section One of Woodgate Subdivision in Harris County on property that appellants contend is traversed by a portion of the Addicks Fault System. Consequently, they claim, their homes and lots have suffered a loss in value due to their proximity to the fault line. To support their contention that Wood Bros. knew or should have known the fault existed, they point to testimony intended to show that Wood Bros. concealed a drop-off and constructed houses with unusually thick slabs to delay homeowners' discovery of shifting soil along the flood plain contour that parallels the fault.

The statute of repose protecting construction and repair professionals from indefinite potential liability for completed projects requires that a claimant:

bring suit for damages ... against a person who constructs or repairs an improvement to real property not later than 10 years after the substantial completion of the improvement in an action arising out of a defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement.

Section 16.009(a). The statute, however, does not bar an action "based on wilful misconduct or fraudulent concealment in connection with the performance of the construction or repair." Section 16.009(e)(3). Appellants contend there is a genuine issue of material fact regarding Wood Bros.'s wilful misconduct or fraudulent concealment of the fault.

Wood Bros. has not denied the existence of a fault; however, it filed an affidavit by employee John McDonald stating that "at no time during the development of the subdivision did Wood Bros. have any knowledge of the existence of or the possibility of the existence of a geological fault in the vicinity of Woodgate Section One." In addition, a company that provided engineering services in connection with the development of Woodgate did not indicate to Wood Bros. the existence of a fault line in the subdivision.

Appellants offered both expert and lay testimony purporting to show that Wood Bros. knew or should have known about the fault and actively undertook to mask its existence, movement, and effects. The affidavit of Dr. Carl Norman, a geology professor at the University of Houston, stated that evidence of the Addicks Fault System has been present since before 1915. He explained that "maps from 1915–17 show the topographic anomaly associated with the Addicks Fault System, a portion of which passes through the Woodgate subdi-

---

1. Section 16.009 is an ultimate statute of repose that bars claims after the prescribed 10–year period. *Tumminello v. U.S. Home Corp.,* 801 S.W.2d 186, 187 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Appellants concede the time period for the statute of repose began to run when construction was substantially completed, not when the damage occurred or was discovered.

vision," and maps and articles about the fault system were published in the 1930s. By deposition, Dr. Norman testified the fault was clearly visible in aerial photographs Wood Bros. utilized in its construction activities in the Woodgate subdivision. In Dr. Norman's opinion, the fault was obvious to appellees at the time Woodgate was developed "and should have been reckoned with rather than concealed."

Appellees counter that what was apparent to a geologist was not necessarily evident to the developers; however, appellants also rely on the testimony of a lay witness, Rev. Robert Ferguson, pastor of a church located at the entrance of the Woodgate subdivision. Before Woodgate was developed, Rev. Ferguson observed that the lower southeast corner of the subdivision was approximately two feet lower than the rest of the subdivision and there was a visible drop-off that was "readily recognizable" and "should have been recognizable to anyone, really." After Wood Bros. brought large earth-moving machines to haul in dirt and fill the southeast corner of the subdivision, the "fault line, of course, that was visible before this operation was not visible after," the pastor testified. Dr. Norman explained that the grading and filling operations "would have the effect of concealing the prominent and obvious drop-off or 'scarp' associated with the fault so homebuyers wouldn't have been able to see the fault when purchasing homes." Moreover, most homebuyers would not suspect that conditions such as fractured sheetrock, sticking doors, and cracks in their driveways were the result of an active fault. Appellants say they did not begin noticing these defects until 1976.

■ A plaintiff alleging fraudulent concealment as an affirmative defense must show that the defendant had actual knowledge of the facts he is alleged to have concealed. *Texas Gas Exploration Corp. v. Fluor Corp.*, 828 S.W.2d 28, 32–33 (Tex.App.—Texarkana 1991, writ denied); *Rascoe v. Anabtawi*, 730 S.W.2d 460, 462 (Tex.App.—Beaumont 1987, no writ); *Dotson v. Alamo Funeral Home*, 577 S.W.2d 308, 311 (Tex.Civ.App.—San Antonio 1979,

no writ). One cannot fraudulently conceal facts of which one has no actual knowledge. *Nichols v. Smith*, 489 S.W.2d 719, 723 (Tex.Civ.App.—Fort Worth 1973, *aff'd*, 507 S.W.2d 518 (1974)). Further, there must be a showing of a fixed purpose to conceal the wrong. *Carrell v. Denton*, 138 Tex. 145, 157 S.W.2d 878, 879 (1942). Likewise, the allegation of wilful misconduct bears the element of intent that is missing from appellants' summary judgment evidence. At best, appellants' evidence suggests that Wood Bros. should have known about the alleged fault, but there is no proof that Wood Bros. had actual knowledge of a fault, much less that it purposely concealed that knowledge from potential homebuyers. The land-leveling operations, for example, might occur with the improvement of any subdivision that is being developed. Without summary judgment evidence supporting the essential element of intentional misconduct or fraudulent concealment, appellants' claims against Wood Bros. are barred by the statute of repose. Point of error number one is overruled.

■ In their second point of error, appellants contend the trial court erred in granting M & T's motion for summary judgment as there were genuine issues of material fact concerning M & T's extensive involvement in the development of the subdivision. Appellants argue that M & T had liens against all of appellants' lots during the construction-financing phase of the development, and Wood Bros. directed homebuyers to obtain mortgage financing from M & T. Moreover, appellants assert that M & T had actual knowledge of the Addicks Fault System during its involvement with Woodgate. C. Harold Wallace, then-executive vice president of M & T, admitted he was informed that a fault affected a nearby subdivision being developed by a division of M & T, yet he did not notify potential homebuyers in that subdivision of the reported existence of a fault. However, Wallace denied any knowledge of a fault existing in Woodgate.

Appellants cite no Texas case permitting a homeowner to hold a lender liable in negligence for loaning money to a develop-

er who constructed a defective house. However, appellants' contentions are similar to allegations raised in *Connor v. Great Western Sav. and Loan Assoc.*, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968) (en banc). In *Connor*, the buyers of homes that had been negligently constructed sought damages from both the builder of the homes and Great Western, the savings and loan association that financed their development. The homebuyers contended that (1) Great Western was vicariously liable because its participation in the development brought it into a joint venture or joint enterprise with the homebuilder, and (2) Great Western breached an independent duty of care to the homebuyers. Regarding joint venture or joint enterprise, the *Connor* homebuyers established that Great Western and the builder had "combined their property, skill, and knowledge to carry out the tract development, that each anticipated receiving substantial profits therefrom, and that they cooperated with each other in the development." However, because they did not share in each other's profits or losses and neither had an interest in payments received by the other, the California Supreme Court found that no joint venture or joint enterprise existed.

■ Essential elements of a joint venture or a partnership include: (1) a community of interest in the venture/partnership; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise. *Federal Deposit Ins. Corp. v. Claycomb*, 945 F.2d 853, 858 (5th Cir.1991) (citations omitted), *cert. denied, SHWC, Inc. v. FDIC*, —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992). Where any one of these elements is absent, no joint venture or partnership exists. *Id.* M & T did not share or agree to share in profits or losses in the Woodgate subdivision, nor did it hold ownership interest in the homes. Here, as in *Connor*, there was no joint venture.

■ In *Connor*, however, even though Great Western was not vicariously liable as a joint venturer for the builder's negligence, the court agreed that, by becoming "much more than a lender," Great Western assumed a duty to the homebuyers to exercise reasonable care to protect them from damages caused by major structural defects:

> It became an active participant in a home construction enterprise. It had the right to exercise extensive control of the enterprise. Its financing, which made the enterprise possible, took on ramifications beyond the domain of the usual money lender. It received not only interest on its construction loans, but also substantial fees for making them, a 20 percent capital gain for "warehousing" the land, and protection from loss of profits in the event individual home buyers sought permanent financing elsewhere.

*Id.* 447 P.2d at 616. Thus, there remained the question of Great Western's liability for its own negligence. In this regard, the court held that Great Western knew or should have known of expansive soil problems, yet it failed to require soil tests, examine foundation plans, discover gross structural defects, or recommend remedies. *Id.* at 616–17. Here, appellants lodge similar complaints, although it should be stated at the outset that we know of no obligation upon a bank to inspect construction of houses on behalf of homeowners. Indeed, appellants cite no case to suggest that a cause of action for "negligent lending" exists in Texas.

■ As previously explained, appellant did not establish the essential predicate of a partnership or joint venture to create a fiduciary duty. Regarding M & T's liability for its own negligence, if any, the relationship between a borrower and its lender generally does not create a fiduciary duty or impose a duty of good faith and fair dealing. *Federal Dep. Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–09 (Tex.1990); *Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.*, 819 S.W.2d 607, 610–11 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Lovell v. Western Nat'l Life Ins. Co.*, 754 S.W.2d 298, 302 (Tex.App.—Amarillo 1988, writ denied). M & T concedes, however, that in certain circumstances, Texas courts have recognized a cause of action based on negligent misrepresenta-

tion, as expressed by the Restatement (Second) of Torts § 552 (1977):

> One, who in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rosenthal v. Blum*, 529 S.W.2d 102, 104 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.). In fact, negligent misrepresentation was applied to lending institutions in *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439 (Tex.1991). However, the offense does not apply here as appellants testified that M & T made no representations, promises, guarantees, warranties, or statements to them in connection with the purchase of their homes. At least seventeen of the appellants never had mortgages with M & T; the remaining twenty-four obtained or assumed mortgages from M & T after they had already agreed to purchase their homes from a third party. With no showing of a breach of fiduciary relationship and no detrimental reliance on representations made by M & T to appellants, the trial court properly granted summary judgment regarding appellants' claims of negligence.

 M & T's motion for summary judgment also asserted the DTPA does not provide appellants a cause of action against M & T. Ten of the appellants[2] purchased their homes before September 1, 1975, or before the DTPA was amended to incorporate "real property." *Ferguson v. Beal*, 588 S.W.2d 651, 653 (Tex.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). On appeal, however, these appellants contend that M & T "serviced" their mortgage loans, thus their DTPA claims are not time-barred regarding such services. However, in their pleadings appellants did not allege defects in these services. In the absence of any claim concerning collateral services, summary judgment was proper on the DTPA claims of these ten appellants. *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 175 (Tex.1980); *see* Tex.Bus. & Com. Code Ann. § 17.45(4) (Vernon 1987). *Riverside* also established that a person who seeks to borrow money only is not a "consumer" under the DTPA, with respect to the lender. *Id.* at 174–75; *Cent. Texas Hardware, Inc. v. First City, Texas-Bryan, N.A.*, 810 S.W.2d 234, 236 (Tex. App.—Houston [14th Dist.] 1991, writ denied). Unless the lender has some connection with the actual sales transaction or has committed a deceptive act related to financing the transaction, the lender is not liable under the DTPA and appellants have no standing to sue under the statute. The summary judgment entered on appellants' DTPA claims was proper.

Further, as the DTPA does not create warranties, any alleged warranty must have been established independently from the DTPA. *Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex.1987); *Easterly v. HSP of Texas, Inc.*, 772 S.W.2d 211, 214 (Tex.App.—Dallas 1989, no writ). Here, there is no express warranty imposed by agreement of the parties, and the implied warranty of merchantability applies only to transactions involving goods, not to the construction or sale of a house. *Haney v. Purcell Co.*, 796 S.W.2d 782, 786 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Appellants cite no controlling case that has recognized an implied warranty from a lender to its customer, much less a third party.

Next, appellants contend that summary judgment was improper as to their claims of fraud, wilful misconduct, fraudulent concealment, misrepresentation, and violation of the Fraud in Real Estate and Stock Transactions Act, Tex.Bus. & Com.Code Ann. § 27.01 (Vernon 1987). As previously discussed, M & T made no representations to appellants concerning the houses, therefore appellants did not establish a cause of action in fraud or misrepresentation. Fur-

---

2. Glenna A. Baskin, Diana Wagner Ford, Carolyn Freytag, Patricia Haydel, M/Mrs. Larry D. Rose, M/Mrs. Jimmy D. Sherer, and M/Mrs. William H. Smith, Jr.

ther, § 27.01 does not apply because there was neither a contract nor a sale of land between M & T and any of the appellants. *Nolan v. Bettis,* 577 S.W.2d 551, 555–56 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.).

For the foregoing reasons, we overrule appellants' second point of error.

In their final point of error, appellants contend the trial court erred in refusing to grant their objections to certain summary judgment evidence.

First, they complain that a Wood Bros. exhibit and excerpts from Dr. Norman's deposition were served fewer than twenty-one days before the time specified for the hearing, as is required by Tex.R.Civ.P. 166a(c). However, appellants failed to demonstrate any alleged harm, and they concede that the trial court did not rule on their objections.

Second, they contend that a crucial affidavit by M & T's litigation coordinator, Linda Spagnola, was not based on personal knowledge, contained inadmissible hearsay, included attachments not properly documented, and attempted to give expert opinions and inadmissible conclusions rather than statements of fact. M & T's motion for summary judgment relied heavily on the Spagnola affidavit, which appellants contend is "clearly defective" because it does not affirmatively show how Spagnola became personally familiar with the facts in question. However, in the first paragraph of her affidavit, Spagnola explains that, as litigation coordinator for M & T, she reviewed the loan files of those plaintiffs who received loans from M & T, she searched M & T files for documents related to Woodgate, and she reviewed documents attached to a Wood Bros. exhibit. In the succeeding fifteen paragraphs, Spagnola detailed the findings of her research. Appellants also complain that Spagnola did not lay proper predicate for the admissibility of the documents she reviewed as "business records." Tex.R.Civ.Evid. 803(6). To the contrary, Spagnola's affidavit established that the files were maintained for those plaintiffs who obtained loans from M & T, and that true and correct copies of the files were attached to the affidavit. Finally, appellants contend that M & T did not qualify Spagnola as an expert and "many of the statements" in her affidavit were "conclusory." Again, we disagree. The affidavit merely set out facts, not disputed by competent summary judgment proof, regarding M & T's involvement in the subdivision. Point of error three is overruled.

We affirm the judgment of the trial court.