**Angela N. HOLDER, formerly known as Angela N. Hamilton, Appellant,**

v.

**MELLON MORTGAGE COMPANY and City of Houston, Appellees.**

No. 14–96–00043–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 14, 1997.

Rehearing Overruled Nov. 26, 1997.

Laura Anne Coats, Robert M. Schick, Catherine B. Smith, Kathleen A. Gallagher, Houston, for appellee.

Before YATES, HUDSON and FOWLER, JJ.

## MAJORITY OPINION

FOWLER, Justice.

Angela N. Holder ("Holder"), formerly known as Angela N. Hamilton, appeals from a summary judgment granted in favor of Mellon Mortgage Company ("Mellon") and from a dismissal in favor of the City of Houston ("the City"). Holder sued both Mellon and the City after she was sexually assaulted by a Houston police officer in Mellon's parking garage. In this appeal, Holder raises three points of error alleging that the trial court erred in granting Mellon's motion for summary judgment, in sustaining Mellon's objection to the affidavit and report of her expert witness, and in granting the City's motion to dismiss. We affirm in part and reverse and remand in part.

### I. Background

Holder was driving home at approximately 3:30 a.m. on the morning of November 8, 1992, when Calvin Potter ("Potter"), an on-duty City police officer, stopped her for an apparent traffic violation near downtown Houston. After stopping Holder and taking her identification and insurance card, Potter ordered Holder to follow him. Driving his City squad car, Potter led Holder to the third floor of Mellon's garage less than six blocks away. The garage was unsecured and deserted, and while at the garage, Potter sexually assaulted Holder in the City's police car. After Holder reported the assault, Potter was arrested, tried, convicted, and sentenced to four years in prison.

Holder filed suit against Mellon and the City on June 27, 1994, alleging theories of negligence. Against Mellon, she alleged negligence per se for violation of section 10–361 of City Ordinance No. 93–1570 ("the Ordinance") because the garage was a "dangerous building" within the meaning of the Ordinance. She also alleged common law

Kenneth M. Morris, David A. Furlow, Houston, for appellant.

negligence for Mellon's failure to exercise reasonable care to prevent a foreseeable injury caused by permitting its garage to remain open, easily accessible, unattended, and poorly lit. She also pleaded that this negligence constituted gross negligence. In addition, she asserted a claim for loss of consortium on behalf of her minor child. In her claim against the City, Holder alleged City employees were negligent in their supervision of Potter and his use of the City patrol car.

Mellon moved for summary judgment on the grounds that (1) the City Ordinance is inapplicable to the facts presented here; (2) Mellon owed Holder no legal duty because she was a trespasser, not an invitee, and it has no general duty to prevent criminal acts of third parties outside its control; (3) the criminal conduct in this case was not foreseeable; (4) Mellon's conduct was too remotely connected to Holder's injuries to establish legal causation; and (5) the child's loss of consortium claim fails because Holder did not allege serious, permanent, and disabling physical injury.

On November 6, 1995, the trial court granted Mellon's motion for summary judgment, but its order did not specify the ground on which summary judgment was granted. The trial court also sustained Mellon's objection to the affidavit and report of Holder's security expert, Horace B. Loomis.

The City properly pleaded its affirmative defense of sovereign immunity and moved to dismiss Holder's suit on that basis. It argued that Holder's claims do not fall within the limited waiver of governmental immunity provided in the Texas Tort Claims Act ("TTCA"). TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.001–.009 (Vernon 1986 & Supp.1997). The trial court granted the City's motion to dismiss for lack of jurisdiction on November 6, 1995, the same date it granted Mellon's motion for summary judgment.

## II. Summary Judgment

■ In Holder's first point of error, she asserts generally that the trial court erred in granting Mellon's motion for summary judgment. This single, broad point is sufficient to preserve error on all grounds for summary judgment raised by Mellon. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970).

### A. Standard of Review

In reviewing a summary judgment, we take the evidence favorable to the non-movant as true and indulge every reasonable inference in the non-movant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). When a trial court does not specify the grounds upon which it grants a summary judgment, as here, we will affirm the judgment if any one of the theories advanced in the motion is meritorious. *State Farm Fire & Casualty Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993); *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989). Summary judgment for the defendant is proper when the proof shows that there is no genuine issue of material fact as to one or more of the essential elements of the plaintiff's cause of action. *Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990). In other words, a defendant must disprove, as a matter of law, one of the essential elements of a plaintiff's cause of action. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991).

### B. Facts

We review the facts under the appropriate standard of review for summary judgments, taking evidence favorable to the non-movant as true. *See Nixon,* 690 S.W.2d at 548–49. Mellon has owned the garage since at least 1989, and controlled and operated it since October 1, 1992, when it canceled its previous management contract with Allright Parking. The garage is not a public garage and is used for Mellon's employees during normal business hours. Peter Rzasnicki, Mellon's CEO, made the decision that Mellon would take over control of the garage. Rzasnicki placed Curtis Oblinger in charge of the garage, even though he had no prior experience in operating a parking facility. Mellon did not make efforts to investigate crime in the area or to determine whether additional security measures were needed at the garage.

Holder provided summary judgment proof to support her contention that the garage is in a high crime area. Her evidence consisted of, among other matters, HPD's crime statistics showing that from January 1, 1990 through the date of the incident, 190 violent crimes, including murders, rapes, robberies, and aggravated assaults, were reported within a quarter-mile radius of the garage. Holder contends that because of this evidence of previous crimes, the assault on her was foreseeable, creating a duty for Mellon to take steps to prevent such an attack.

Oblinger acknowledged in his deposition testimony that he had known since Mellon took over responsibility for the garage on October 1, 1992, that parking garages in Houston are inherently susceptible to criminal activity. He acknowledged that on weekends, from 11:45 p.m. on Fridays until 6:00 a.m. on Mondays, there were no security guards at the garage, although Mellon arranged for an armed guard from 6:00 a.m. to 11:00 p.m. Monday through Friday. In addition, an off-duty police officer randomly patrolled the garage during business hours. Potter, however, was never employed by Mellon nor did he act under its supervision and control. During the times the garage was not in use by Mellon employees on nights and weekends, there were no security gates, no chained or fenced entrances, and no barriers to pedestrian or vehicular traffic. Oblinger knew beer drinkers frequented the garage on weekends by the beer bottles found on Monday mornings. It was also apparent that people were sleeping in the stairwells from blankets and rolled up newspapers found there. Oblinger acknowledged that a chain costing between $10 to $20 could have prevented vehicular entry. In fact, Mellon began chaining the entrances to the garage in July 1993, several months after the assault on Holder.

John Hilliard, a Mellon employee, testified by deposition that his jeep was stolen out of the garage in October 1992. Hilliard sent a memo to Oblinger, among others, on or about October 27, 1992, expressing his concern about a "drastic increase in crime in the surrounding area" in the previous six months. Hilliard had heard rumors of criminal activity, including reports of violent crime in the surrounding area, from other Mellon employees. He proposed a plan for increased security. Oblinger never responded to Hilliard's memo.

Holder also furnished a copy of an e-mail sent to Oblinger and others from Cathleen Hackward, another Mellon employee. Hackward wrote to "lodge a formal complaint about the virtually non-existent security for our parking garage since Mellon took over the job." She wrote that "people are free to roam through there, obviously committing crimes," and she was concerned for her personal safety. Hackward also testified by deposition that she had Mellon's security guard escort her to the garage when she worked late because she did not consider it safe to go to the garage alone.

Oblinger's affidavit stated that Mellon was unaware of any violent crimes occurring in the garage before this incident and that to his knowledge only two instances of car theft had been reported. Oblinger also testified the garage is well-lighted at all times. In addition, Mellon provided undisputed testimony that neither Holder nor Potter had permission to be in the garage at the time of the assault.

## C. Negligence Per Se

We first address Holder's contention that the trial court erred in granting summary judgment for Mellon because it was negligent as a matter of law. She contends Mellon, by leaving its garage unsecured, violated the Ordinance against dangerous buildings that was designed to protect the public, of which she is a member. Mellon denies that the Ordinance is applicable to its garage.

The Ordinance is found in Article IX of the Houston Code, which is designated as the "Comprehensive Urban Rehabilitation and Building Minimum Standards Code" ("the Code").[1] Section 10–361 of the Code defines

---

1. Holder relies on the 1993 version of the Ordinance, although the 1992 version technically applies because the incident occurred on November 8, 1992. The parties agree that the 1992 and 1993 versions of the applicable provisions are

"dangerous buildings" in relevant part as follows:

> (a) All buildings, structures, dwellings, dwelling units, and accessory buildings, regardless of their date of construction, that have any of the following defects are deemed to be dilapidated, substandard or unfit for human habitation and a danger to the public health, safety and welfare, and are further declared to be dangerous buildings:
>
> * * *
>
> (11) Buildings and structures, regardless of their structural condition, that have during times that they were not actually occupied by their owners, lessees or other legal invitees, been left unsecured from unauthorized entry to the extent that they may be entered by vagrants or other uninvited persons as a place of harborage or could be entered by children.

Section 10–362 of the Code provides that "dangerous buildings" as defined therein "shall be vacated, secured, repaired, removed or demolished as hereinafter provided or otherwise abated."

Holder does not maintain that Mellon's parking garage was structurally unsound. Curtis Oblinger, Mellon's vice president and manager in charge of the maintenance and security of the garage at the time of the assault, testified the garage was well-built and had been properly maintained. In addition, evidence in the record shows Mellon's parking garage has never been cited by the City for violation of this Ordinance or any other building code or ordinance. Thus, we need only consider whether Mellon violated the dangerous building Ordinance by leaving its garage open and unsecured at nights and on weekends when the garage was not in regular use by Mellon employees.

■ The unexcused violation of an ordinance constitutes negligence as a matter of law if such ordinance was designed to prevent injury to the class of persons to which the injured party belongs. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 312 (Tex.1987); *Nixon,* 690 S.W.2d at 549. According to the

substantially the same. *See* Houston City Ordi-

express language of section 10–361, this Ordinance was designed to prevent "a danger to the public health, safety and welfare," and Holder is certainly a member of the public. Therefore, she falls within the class of persons that the Ordinance was designed to protect. *See Nixon,* 690 S.W.2d at 549.

■ The real issue before us is whether the Ordinance is intended to cover a parking garage that is "not actually occupied" at night and on weekends, or whether, as Mellon argues, it only applies to abandoned, long-vacant buildings. Courts are guided by the same principles in interpreting a city ordinance that are generally followed in construing statutes. *Mills v. Brown,* 159 Tex. 110, 316 S.W.2d 720, 723 (1958); *see also, e.g., Grothues v. City of Helotes,* 928 S.W.2d 725, 728 (Tex.App.—San Antonio 1996, no writ). Statutory interpretation is a question of law for the court to determine. *Maley v. 7111 Southwest Freeway, Inc.,* 843 S.W.2d 229, 232 (Tex.App.—Houston [14th Dist.] 1992, writ denied). When we are confronted with a question of statutory construction, we must first determine whether the statute is ambiguous. *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983). If the meaning of the statute is clear and unambiguous, extrinsic aids and rules of construction are inappropriate, and the statute should be given its common, everyday meaning. *Id.*

■ The contentions of the parties in this case amount to a claim of ambiguity. When an apparent ambiguity exists, we are to give the statute a reasonable construction in keeping with the legislative intent. *City of Mason v. West Tex. Utilities Co.,* 150 Tex. 18, 237 S.W.2d 273, 278 (1951). Legislative intent should be determined from the entire act, and not from isolated portions thereof. *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We must read the statute as a whole and interpret it to give effect to every part. *Ex parte Pruitt,* 551 S.W.2d 706, 709 (Tex.1977). When the meaning of the provision is ambiguous, the construction placed upon a provision by the agency charged with its administration is entitled to weight. *Southwest Airlines Co. v. Bullock,*

nance 86–56 § 10–326(a)(7).

784 S.W.2d 563, 568 (Tex.App.—Austin 1990, no writ).

▉ In interpreting a statute or ordinance, we are also guided by rules of construction. *See* TEX. GOV'T CODE ANN. § 311.023 (Vernon 1988). We presume that a just and reasonable result was intended. *Industrial Accident Bd. v. Martinez*, 836 S.W.2d 330, 333 (Tex.App.—Houston [14th Dist.] 1992, no writ). We must consider the consequences that follow from our construction of a statute and avoid absurd results. *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex.1991). It is assumed that those enacting new laws do so with complete knowledge of existing law and with reference to it. *See Acker*, 790 S.W.2d at 301.

In reading the Code as a whole, it is apparent that its purpose is to set minimum standards for building construction, repair, and maintenance. Division 4, which includes section 10–361, covers "Dangerous Buildings." The definition section of the Code provides:

> *Dangerous building* means a substandard, damaged or deteriorated building or improvement that has one (1) or more of the defects or conditions listed in section 10–361 of this Code.

Section 10–361 lists eleven defects or conditions, the first ten of which define a dangerous building as a result of the condition of the building itself, e.g., walls that "lean or buckle." Subsection (11), at issue here, defines a dangerous building based on the vacancy of the building, not on the structural condition of the building. Holder contends the Ordinance does not require buildings to be "vacant" to be dangerous, but instead the Ordinance requires buildings to be secured from unauthorized entry "during the times that they were not actually occupied," which in this case is at nights and on weekends.

Our reading of other relevant provisions of the Code leads us to conclude the City Council intended the Ordinance to apply to vacant buildings. Section 10–411 of the Code refers to "vacant dangerous buildings as defined in section 10–361. . . ." Only subsection (11) of section 10–411 can be read to define a "vacant dangerous building." "Vacant" is not defined in the Code; therefore we look to its ordinary meaning. *See* TEX. GOV'T CODE ANN. § 312.002(a) (Vernon 1988). Common, ordinary definitions of "vacant" include "not lived in," "not put to use," "abandoned," or "empty." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1301 (1991). The definition section of the Code provides that the term "vacant dangerous building" means "any structure that was intended for supporting or sheltering any use or occupancy and that is *not presently occupied or in other daily use* by the owner, the owner's lessees, or other invitees and that has been determined to be a dangerous building under this article or by other legal process." § 10–317 (emphasis added). In addition, "occupancy" is defined as "the purpose for which a building, or part thereof, is used or intended to be used." *Id.* Mellon's parking garage is used for its intended purposes on a daily basis during normal business hours. Moreover, there is some evidence in the record that the garage was used late at night and on weekends when Mellon employees worked extra hours. We hold that Mellon's parking garage is not a "vacant dangerous building" as defined in the Code.

In addition, Mellon filed the affidavit of Bea Link, Assistant Director of the Neighborhood Protection Division of the Department of Public Works and Engineering.[2] Link stated that the Ordinance had "no relevance" to a parking garage unless the garage is "structurally unsafe." While Link's statement that, based on her review of the City records, no structurally sound parking ga-

---

**2.** Mellon filed Link's affidavit on November 3, 1995, after the hearing on its motion for summary judgment on October 30, 1995. Holder objected both to the affidavit's untimely filing and its conclusory statement, and requested the trial court strike the affidavit. On November 6, the trial court granted Mellon's motion for summary judgment and by order dated November 15, 1995, the court granted leave to file Link's

affidavit. Rule 166a(c) permits the court to consider summary judgment proof filed after the hearing if filed before judgment and with permission of the court. TEX.R. CIV. P. 166a(c). Holder has not assigned a point of error to the trial court's consideration of Link's affidavit. Nonetheless, we have considered in our discussion the objections to Link's affidavit contained in Holder's brief.

rage has been cited in violation of the Ordinance is proper summary judgment proof, her opinion that the Ordinance was not relevant to parking garages is a legal conclusion. A legal conclusion is insufficient to support a motion for summary judgment as a matter of law. *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex.1991); *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 584 (Tex.1984). Nevertheless, we give some weight to the evidence that the department in charge of enforcing the Ordinance has not applied it to a parking garage unless it was structurally unsafe. *See Texans to Save the Capitol, Inc. v. Board of Adjustment of the City of Austin*, 647 S.W.2d 773, 776–77 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (relying on the city building department's interpretation of a city zoning ordinance governing building height limitations).

Mellon argues that to accept Holder's contention that the Ordinance applies to a structure that is not in use during certain times would lead to an absurd result. Mellon contends that under Holder's interpretation, the Ordinance would apply to homeowners within the City who fail to lock their garages while away at work, leaving them open to access by vagrants or children. We agree that this result was not intended by the city officials in enacting the dangerous buildings Ordinance.

We are also persuaded that Holder's interpretation is incorrect by our review of the provisions in the Local Government Code giving cities authority to regulate dangerous structures. *See* TEX. LOC. GOV'T.CODE ANN. § 214.001 (Vernon Supp.1997) (formerly Vernon's Annotated Civil Statutes, article 1175). Section 214.001(a)(2) contains almost identical language as that found in the Ordinance at issue here, except that it clearly applies to

"unoccupied" buildings left unsecured.[3] The common meaning of "unoccupied" also is "not lived in: empty." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1292 (1991). There is no implication in the Local Government Code that structures that might be "occupied" during weekdays, but "not actually occupied" at night or on weekends were to be included within a city's power to regulate a "dangerous" building.

We conclude, based on the reading of the entire Code in conjunction with the authority granted cities by the legislature, and giving weight to its administrative interpretation, that the Ordinance does not apply to Mellon's parking garage. Accordingly, we overrule point of error one as to Holder's negligence per se claim.

### D. Common Law Negligence and Gross Negligence

Mellon also moved for summary judgment on grounds that it owed no duty to Holder and that its actions were not a proximate cause of Holder's injuries.

#### 1. Common Law Negligence

##### a. Duty

A cause of action for negligence consists of three essential elements: (1) a legal duty owed by one party to another; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Duty is the threshold inquiry in a negligence case. *Id.* The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). To

---

**3.** Section 214.001. Authority Regarding Substandard Building

(a) A municipality may, by ordinance, require the vacation, relocation of occupants, securing, repair, removal, or demolition of a building that is:

(1) dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare;

(2) regardless of its structural condition, *unoccupied* by its owners, lessees, or other invitees and is unsecured from unauthorized entry to the extent that it could be entered or used by va-

grants or other uninvited persons as a place of harborage or could be entered or used by children; or

(3) boarded up, fenced, or otherwise secured in any manner if:

(A) the building constitutes a danger to the public even though secured from entry; or

(B) the means used to secure the building are inadequate to prevent unauthorized entry or use of the building in the manner described in subdivision (2).

TEX. LOC. GOV'T.CODE ANN. § 214.001 (Vernon Supp.1997) (emphasis added).

determine whether the defendant is under a duty, we consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighted against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *Greater Houston*, 801 S.W.2d at 525. Of these factors, the foremost consideration is whether the risk is foreseeable. *El Chico Corp.*, 732 S.W.2d at 311. Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others. *Nixon*, 690 S.W.2d at 549–50. While the existence of a duty is ordinarily a question of law, in some instances, the determination of foreseeability as an element of duty involves the resolution of disputed facts. *Mitchell v. Missouri–Kansas–Texas R.R. Co.*, 786 S.W.2d 659, 662 (Tex.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 247, 112 L.Ed.2d 205 (1990).

Generally, a person has no legal duty to protect another from the criminal acts of a third person. *Phillips*, 801 S.W.2d at 525. Similarly, a landowner has no duty to prevent the criminal acts of a third party who does not act under the landowner's control or supervision.[4] *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993). An exception to this rule arises when criminal conduct is the foreseeable result of a defendant's negligence. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996) (holding that a lessor's duty to protect persons injured on the leased premises does not arise in the absence of a foreseeable risk of harm). This duty developed out of the premise that the party with the "power of control or expulsion" is in the best position to protect against the harm, and when that party "by reason of location, mode of doing business, or observation or past experience, should reasonably anticipate criminal conduct on the part of third persons, ... [that party] has a duty to take precautions against it." *Exxon*, 867 S.W.2d at 21 (quoting *Morris v. Barnette*, 553 S.W.2d 648,

649–50 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.)).

■ When criminal conduct is foreseeable, the defendant has a duty to prevent injuries to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured. *Haight v. Savoy Apartments*, 814 S.W.2d 849, 853 (Tex.App.—Houston [1st Dist.] 1991, writ denied). While the criminal conduct of a third party may be a superseding cause that may relieve the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992).

Foreseeability is established by evidence that the premises owner realized or should have realized the likelihood that a third party might avail himself of the opportunity to commit a tort or crime on the premises. *See Nixon*, 690 S.W.2d at 550. Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Walker*, 924 S.W.2d at 377. All that is required is that the injury be of such a general character as might reasonably have been anticipated, and the injured party should be so situated with relation to the wrongful act that injury to her, or one similarly situated, might reasonably have been foreseen. *Nixon*, 690 S.W.2d at 551. Evidence of specific previous crimes on or near the premises raises a fact issue on the foreseeability of criminal activity. *Lefmark Management Co. v. Old*, 946 S.W.2d 52, 56–59 (Tex.1997) (Owen, J., concurring); *Nixon*, 690 S.W.2d at 550–51.

■ The duties owed by a landowner depend upon the role of the person injured on the premises. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex.1975). In Texas, three roles have emerged. An *invitee* enters onto another's land with the owner's knowledge and for the mutual benefit of both parties. *Id.* An owner owes an invitee a duty

---

4. This general rule is not absolute, however. Courts have carved out exceptions when certain special relationships exist. *See, e.g., Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993) (lessor who retains control over the security and safety of the premises owes a duty to a tenant's employee to use ordinary care to protect the employee if the lessor knows or has reason to know of an unreasonable and foreseeable risk of harm from the criminal acts of third parties).

of reasonable care to protect her from foreseeable injuries. *Id.* at 537. A *licensee* is privileged to enter and remain on the premises by the express or implied permission of the owner, but a licensee enters the land for his own convenience or on business for someone other than the owner. *Texas–Louisiana Power Co. v. Webster,* 127 Tex. 126, 91 S.W.2d 302, 306 (1936); *Smith v. Andrews,* 832 S.W.2d 395, 397 (Tex.App.—Fort Worth 1992, writ denied). Finally, a *trespasser* is one who enters property of another without any right, lawful authority or express or implied invitation, permission, or license, and not in performance of any duties for the owner, but merely for his own purposes, pleasure or convenience. *Weaver v. KFC Management, Inc.,* 750 S.W.2d 24, 26 (Tex. App.—Dallas 1988, writ denied).

▮ Owners or occupiers of premises have a duty only to refrain from injuring both licensees and trespassers willfully, wantonly, or through gross negligence. *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974); *Burton Constr. & Shipbuilding Co. v. Broussard,* 154 Tex. 50, 273 S.W.2d 598, 602–03 (1954). In addition, when the licensor has actual knowledge of a dangerous condition and the licensee does not, however, the licensor owes a duty either to warn the licensee of the known dangerous condition or to make the condition reasonably safe. *Peters v. Detsco, Inc.,* 820 S.W.2d 38, 41 (Tex.App.—Houston [14th Dist.] 1991, writ denied). A licensee is imputed with knowledge of those conditions perceptible to him, or the existence of which can be inferred from facts within his present or past knowledge. *See Lower Neches Valley Auth. v. Murphy,* 536 S.W.2d 561, 564 (Tex.1976); *Weaver,* 750 S.W.2d at 26–27.

Texas courts have relied on the RESTATEMENT (SECOND) OF TORTS § 344 when analyzing the duty owed by a business owner in a negligence case involving third-party criminal acts. *See Kendrick v. Allright Parking,* 846 S.W.2d 453, 456 (Tex.App.—San Antonio 1992, writ denied); *Garner v. McGinty,* 771 S.W.2d 242, 244 (Tex.App.—Austin 1989, no writ); *Walkoviak v. Hilton Hotels Corp.,* 580 S.W.2d 623, 625 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). Section 344 states:

> Business Premises Open to Public: Acts of Third Persons or Animals
>
> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344 (1965). Comment f to section 344 further details the circumstances under which such a duty arises:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

RESTATEMENT (SECOND) OF TORTS § 344 cmt. f (1965). Thus, under section 344, a landowner is subject to a general duty of care only when he holds his land open to the public for business purposes, "and then only to those who come upon the land for the purposes for which it is thus held open to the public." *Id.* at cmt. a.

Texas authorities follow this expression of the duty owed to business invitees. In *Wal-*

*koviak,* the plaintiff attended a business convention at a hotel and paid to park at the hotel's parking lot. 580 S.W.2d at 624. As he approached his car in the parking lot that night, he was accosted by two unknown assailants, beaten, stabbed, and robbed. To raise a fact question to defeat the hotel's motion for summary judgment, the victim provided evidence that in the months before this attack, two similar incidents occurred, after which the victims were brought to the hotel for assistance. The plaintiff also provided an affidavit from a security expert that the hotel's security was inadequate. This court held that the proprietor of a public business establishment has the duty to exercise reasonable care to protect his patrons from intentional injuries caused by third persons if he has reason to know that such acts are likely to occur. *Id.* at 625. Liability may arise from the failure to exercise reasonable care to discover that such acts are occurring or are likely to occur, coupled with the failure to provide reasonable means to protect patrons from harm or to give adequate warnings to avoid the harm. *Id.* We concluded that summary judgment was precluded because fact issues existed about whether the hotel had breached this duty. *Id.* at 626.

In a premises liability case involving a parking garage where a customer sued after she was robbed at gunpoint and her car was stolen, the First Court rejected the garage operator's contention that it had no duty to provide security, or a safe and secure place to park, or to warn when it provided no security. *Allright, Inc. v. Pearson,* 711 S.W.2d 686, 690 (Tex.App.—Houston [1st Dist.] 1986 ), *aff'd in part and rev'd in part on other grounds,* 735 S.W.2d 240 (Tex.1987). The court found the evidence supported a breach of that duty because the customer's security expert testified that the garage's security was inadequate, the garage was located in a high crime area, and a prudent person should have anticipated that a robbery could occur. *Id.* at 692. The garage's uncontrolled entrances and exits, with no personnel on duty and no notices of the attendant's schedule, made it foreseeable that a robbery could occur. *Id.*

Another premises liability case involving a parking facility is *Ronk v. Parking Concepts of Texas, Inc.,* 711 S.W.2d 409 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). In *Ronk,* the court of appeals affirmed a summary judgment for the defendant because there was insufficient evidence of past criminal violence on the premises, or other circumstances which would have placed the owner on notice of a dangerous condition. *Id.* at 419. Therefore, the plaintiff failed to raise a fact question whether the parking lot owner was negligent for failing to foresee an assault on its business invitee, even though the plaintiff provided evidence of seventeen various criminal incidents reported in a two-year period before the assault, either on the premises or in the immediate vicinity. *Id.* at 416–19. The court distinguished *Pearson* because the plaintiff in *Ronk* provided no expert testimony regarding the issue of foreseeability. *Id.; see also Midkiff v. Hines,* 866 S.W.2d 328 (Tex.App.—Houston [1st Dist.] 1993, no writ) (reversing a summary judgment because fact questions existed as to the foreseeability of criminal conduct of third parties at the defendant's drive-through restaurant and whether the defendant's inadequate security caused the victim's murder); *Kendrick,* 846 S.W.2d at 458 (fact questions as to the foreseeability of the kidnapping and rape of a parking lot customer precluded summary judgment).

The Texas Supreme Court has never directly addressed the duty question that confronts us in this case. In *Nixon,* the supreme court considered foreseeability in the context of the duty imposed by an ordinance. 690 S.W.2d at 549. The plaintiff alleged that the defendant apartment building owner's violation of an ordinance requiring owners of vacant buildings to keep doors and windows securely closed to prevent unauthorized entry allowed a third party to commit rape inside a vacant apartment. The supreme court rejected the argument that the victim was a trespasser and determined that because the innocent victim committed no wrong in coming onto the property *and* the ordinance was meant to protect a larger class than invitees and licensees, the traditional

premises liability distinctions were irrelevant to its analysis.[5] *Id.*

In this case, however, we have found that the Ordinance cited by Holder does not apply to these facts. Thus, we cannot find, as in *Nixon,* that the existence of Mellon's duty is unaffected by the fact that Holder was not an invitee onto its premises. And, unlike courts in some jurisdictions, the Texas Supreme Court has not abandoned the traditional classifications for premises liability actions.[6] *See, e.g., State of Texas v. Williams,* 940 S.W.2d 583, 584–85 (Tex.1996) (per curiam) (setting out the proper jury instructions for premises liability actions when the plaintiff is a licensee or invitee); *State Dep't of Highways & Public Transp. v. Payne,* 838 S.W.2d 235, 236–37 (Tex.1992) (distinguishing different duties owed to invitees and licensees injured by a premises defect). Therefore, we must conclude that these distinctions among trespassers, licensees and invitees are applicable to Holder.

Clearly, Holder was not Mellon's invitee, distinguishing this case from other Texas cases involving criminal conduct at a parking facility. *See, e.g., Kendrick,* 846 S.W.2d at 455; *Pearson,* 711 S.W.2d at 689, *Ronk,* 711 S.W.2d at 416–19; *Walkoviak,* 580 S.W.2d at 624. We are cognizant that section 344 of the RESTATEMENT addresses only the premises occupier's duty of ordinary care to *invitees* to protect them from foreseeable criminal acts of third parties. Nevertheless, we conclude that the lesser duties of care owed to licensees and trespassers also apply in cases of third-party criminal conduct. This position is not unprecedented in Texas. *See*

*Peerenboom v. HSP Foods, Inc.,* 910 S.W.2d 156, 163–64 (Tex.App.—Waco 1995, no writ) (reversing a summary judgment for a defendant-restaurant because fact questions existed as to the foreseeability of a sexual assault on a employee who had the status of a trespasser at the time of the assault).

■ Because Holder had no permission to be at its garage at the time of the assault, Mellon contends we must consider Holder a trespasser. In contrast to the duty to business invitees, the policy and law regarding trespassers provides:

> It has long been the law in Texas that a landowner has no obligation to maintain his premises in a safe condition for strangers entering without authorization. The landowner may assume that persons will not penetrate his boundaries uninvited. Trespassers must take the premises as they find them, and, if they are injured by unexpected dangers, the loss is their own.

*Baldwin v. Texas Utils. Elec. Co.,* 819 S.W.2d 264, 266 (Tex.App.—Eastland 1991, writ denied).

■ Based on the circumstances of this case, we determine that Holder's status is in the nature of a licensee. A gratuitous licensee has been described as one whose presence upon the premises is solely for the visitor's own purpose in which the possessor of the property has no interest, either business or social, and to whom the privilege of entering is extended as a mere favor by express consent or by general custom. *Gonzalez v. Broussard,* 274 S.W.2d 737, 739 (Tex. Civ.App.—San Antonio 1954, writ ref'd n.r.e.) (classifying employee's child injured at drive-

5. We cannot tell from the opinion if the court would have rejected traditional premises liability distinctions if the ordinance had not controlled the outcome, *see Nixon,* 690 S.W.2d at 549, and the court has not addressed the issue since then. In fact, when the court has had occasion to refer to *Nixon* more recently, it has not addressed this aspect of the case. For example, in a recent concurring opinion, Justice Owen commented on *Nixon,* without referring to the court's determination that the victim was not a trespasser, and stated only that the ordinance controlled the outcome. *Lefmark,* 946 S.W.2d at 58 (Owen, J., concurring).

6. "Reflecting the growing trend to hold the property occupier liable for injuries suffered on the

premises, many states have eliminated the premises liability classifications as solely determinative." Friedman and Worthington, *Trends in Holding Business Organizations Liable for the Criminal Acts of Third Persons on the Premises: A Texas Perspective,* 32 S.Tex.L.J. 257, 267 (1991). Texas is not among the states that have abandoned the traditional distinctions for determining the duty owed to entrants on land. *See Nixon,* 690 S.W.2d at 551–54 (Kilgarlin, J., concurring) (advocating abandoning the landowner liability distinctions as "one of the last vestiges of feudalism" and substituting a general duty of ordinary care under the circumstances). While we see merit in Justice Kilgarlin's argument, our supreme court has chosen not to follow it.

in theater's playground while on premises with owner's permission as a licensee). Gratuitous licensees include pedestrians taking short cuts across parking lots, *see Weaver,* 750 S.W.2d at 26–27 (individual who slipped on grease while taking short cut through a parking lot may be considered licensee); *Boss v. Prince's Drive-Ins.,* 401 S.W.2d 140, 142 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.) (individual who was threatened with assault when he returned to a drive-in restaurant parking lot where his companion had left his vehicle occupied status of licensee); *see also Cochran v. Burger King Corp.,* 937 S.W.2d 358, 362 (Mo.App. W.D.1996) (pedestrian injured when taking a short cut across the defendant's parking lot was considered a gratuitous licensee where the lot was open, the restaurant could anticipate people would use it even when it was closed, and there was no indication that the restaurant discouraged such traffic), as well as "loafers, loiterers, and people who come in only to get out of the weather." [7] W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 60, at 413 (5th ed.1984). One may also be a gratuitous licensee when a landowner has tolerated a trespass for such a period of time that the public believes it has "permission" to use the property. *See Murphy v. Lower Neches Valley Auth.,* 529 S.W.2d 816, 820 (Tex.Civ. App.—Beaumont 1975), *rev'd on other grounds,* 536 S.W.2d 561 (Tex.1976) (holding that a boy who was injured after diving into a canal was a gratuitous licensee, not a trespasser, based on evidence boys swam in the canal every day and no signs prohibited such activity). Because Mellon allowed its garage to remain open and accessible on nights and weekends, those entering it may be considered gratuitous licensees with implied permission to enter the garage.[8]

The duties owed to gratuitous licensees are expressed as follows:

[T]he possessor of the premises does not owe to the gratuitous licensee the duty of exercising reasonable care to discover the condition of the premises. He does, nevertheless owe the licensee the duty of refraining from willfully or wantonly causing him injury or from committing active negligence resulting in his injury, and, if the harm caused to the gratuitous licensee is the result of a natural or artificial condition of the property, known to the possessor of the property and which he should realize involves an unreasonable risk to the licensee and has reason to believe that the licensee will not discover the condition or realize the risk, the possessor owes the licensee the duty to make the condition reasonably safe or to warn him of the condition and the risk involved therein.

---

7. Even if we had not determined that Holder was a gratuitous licensee under these facts, some law exists to support a conclusion that the law should not designate as a trespasser one taken against her will onto another's property. *See Nixon,* 690 S.W.2d at 554 (Spears, J., concurring) (rejecting a rigid application of the traditional entrant categories, noting that although the victim entered the defendant's property without the defendant's knowledge or consent, "it would be manifestly unjust to classify her as a trespasser when she was dragged on the property by a rapist"). The summary judgment evidence supports an inference that Holder believed she had no choice but to follow Potter to the garage. In her affidavit, Holder stated: "I felt that I had no options during this ordeal. I was extremely frightened that this was a police officer and that he was someone who would have access to any information in the world about me.... I honestly feel that if I had attempted to run, I would have been stopped—I feel that he would probably have said that I was resisting arrest and would have shot me as I ran." Holder argues she was privileged to enter the garage because she feared for her

safety if she did not follow Potter's orders and that, for her own protection, she remained at the garage until Potter allowed her to leave. *See* RESTATEMENT (SECOND) OF TORTS § 197(1) (1965).

8. The RESTATEMENT now includes its discussion of gratuitous licensees under the general section for licensees. *See* RESTATEMENT (SECOND) OF TORTS §§ 330, 331 (1965). We are aware that "[a] failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavoidable, rather than consent to enter as a licensee." *Id.* at § 330, cmt. c. In this case, however, the only evidence in the record indicates that it would not have required burdensome or expensive measures to prevent access to Mellon's garage. Oblinger testified by deposition that there was "no reason" Mellon could not have put up fences or at least used a chain and lock, that these measures would have prevented Potter from driving into the garage, and that these measures were not cost prohibitive.

*Gonzalez,* 274 S.W.2d at 739 (citations omitted). Recently, the Texas Supreme Court clarified the proper jury instructions to be given in premises liability cases when the plaintiff is a licensee. *Williams,* 940 S.W.2d at 584–85. In addition to the defendant's duty not to injure the plaintiff willfully, wantonly or through gross negligence, the jury should be instructed as follows when the plaintiff is a licensee:

> With respect to the condition of the premises, defendant was negligent if—
>
> a. the condition posed an unreasonable risk of harm;
>
> b. defendant had actual knowledge of the danger;
>
> c. plaintiff did not have actual knowledge of the danger; and defendant failed to exercise ordinary care to protect plaintiff from danger, by both failing to adequately warn plaintiff of the condition and failing to make that condition reasonably safe.

*Id.* In this case, there are fact questions as to Holder's and Mellon's actual knowledge of the risk of criminal conduct at the garage.

 The type of business a defendant operates may increase the foreseeability of a criminal attack. Operation of a parking structure may pose a "peculiar attraction" and create "an especial temptation and opportunity" for criminal misconduct. *Gomez v. Ticor,* 145 Cal.App.3d 622, 628, 632, 193 Cal.Rptr. 600, 604, 607 (1983). "[T]he deserted ... nature of these structures, especially at night, makes them likely places for robbers and rapists to lie in wait." *Id.* The RESTATEMENT notes that in situations where the property affords "a peculiar temptation or opportunity for intentional interference likely to cause harm," the defendant is required to guard against the intentional, or even criminal, conduct of others. RESTATEMENT (SECOND) OF TORTS § 302B, cmt. e, subcmt. G (1965). By leaving its garage open and unattended, Mellon attracted or provided a climate for criminal activity, including violent crimes. *See Kendrick,* 846 S.W.2d at 458 (recognizing the distinction between premises that are prone to attract criminal activity and those that are not); *cf. Castillo v. Sears, Roebuck & Co.,* 663 S.W.2d 60, 66 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (recognizing that to leave a washateria open and unattended all night may impose a duty on the business to provide some sort of security whereas that duty may not apply to a department store in a mall with employees present).

We therefore find fact questions exist as to the foreseeability of a criminal assault such as this in Mellon's garage. Evidence of other crimes in the area, the memos from employees alerting Mellon about crime in the area, Oblinger's admission that parking garages in Houston are inherently susceptible to criminal activity, and the expert testimony from Holder's security expert are sufficient to raise a fact question on the foreseeability of criminal conduct such as the assault on Holder. *Cf. Barefield v. City of Houston,* 846 S.W.2d 399, 403 (Tex.App.—Houston [14th Dist.] 1992, writ denied) (holding that general knowledge about criminal activity in the downtown Houston area is insufficient to raise a fact issue on foreseeability of criminal conduct in the absence of evidence of specific crimes in the area). As noted earlier, although other factors exist, foreseeability is the most important factor in establishing duty. In addition, the only evidence contained in the record shows that requiring the landowner to take some measures to close the entrance of the garage would not be a prohibitive burden. Consequently, we conclude that a fact issue exists as to duty.

**b. Proximate Cause**

 In addition to the existence of a legal duty, we must also consider causation because Mellon is entitled to summary judgment if it established conclusively that its conduct was not a proximate cause of Holder's injury. Proximate cause consists of cause in fact and foreseeability. *Travis,* 830 S.W.2d at 98. The test for cause in fact is whether the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995).

We reject Mellon's contention that there is no causation as a matter of law. We find

Mellon's failure to secure its garage was not "too attenuated" to constitute legal cause. *Cf. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995) (holding that club's failure to investigate, screen, or supervise volunteers was not cause in fact of injuries from sexual molestation of boys, since investigation of volunteer's criminal record would have revealed two misdemeanor driving while intoxicated convictions that would not have precluded volunteer's presence at club). Evidence exists in the record that the condition of Mellon's garage was a substantial factor in bringing about Holder's injury: but for the secluded nature of Mellon's garage, protected from view and easily accessible, the assault may not have occurred. Mellon argues that Potter would have taken Holder somewhere else, but the only summary judgment evidence in the record indicates that there was no other site in the area providing these conditions.

Mellon cites *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex.1995) for the proposition that legal cause is not established if the defendant's conduct does no more than furnish the condition that makes the plaintiff's injury possible. *Union Pump* is not a premises liability case and its statement that causation is absent if a defendant merely furnishes a "condition" permitting injury is antithetical to the basis for imposing liability on landowners to those who come onto their property and are injured by a condition of that property. We consider this aspect of *Union Pump*'s analysis of legal causation to be inapplicable here. Instead, we find that the RESTATEMENT's discussion of causation, as cited by *Nixon*, applies:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a crime, *unless the actor at the time of his negligent conduct realized or should*

*have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.*

*Nixon*, 690 S.W.2d at 550 (citing RESTATEMENT (SECOND) OF TORTS § 448 (1965) (emphasis added)). Based on our discussion of foreseeability, we conclude Mellon failed to negate causation as a matter of law.

### 2. Gross Negligence

 Fact questions also exist as to whether Mellon created, and was aware of, an extreme risk of harm so as to be liable for gross negligence.[9] Gross negligence includes two elements:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and

(2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). In the summary judgment context, the first prong of the test requires the defendant to conclusively establish that there is no genuine issue of fact as to whether its conduct created an extreme degree of risk. *Peerenboom*, 910 S.W.2d at 163–64. The second prong of the test requires the defendant to conclusively establish that there is no genuine issue of fact as to whether it had actual subjective knowledge of an extreme risk of serious harm. *Id.* at 164.

Loomis, Holder's expert, asserted in his report that "[t]he Garage created an unreasonable and extreme risk of harm, and Mellon knew it. Hackward's memo to Oblinger dated October 14, 1992, and Hilliard's memo to Oblinger dated October 27, 1992, show that Mellon's person-in-charge had actual

---

9. There is no pleading or evidence in the record that Mellon injured Holder willfully or wantonly, both of which incorporate higher culpable mental states. *See Baskin v. Mortgage & Trust, Inc.*, 837 S.W.2d 743, 746 (Tex.App.—Houston [14th Dist.] 1992, writ denied) (willful misconduct includes element of intent); *Brown v. Lundell*, 334 S.W.2d 616, 619–20 (Tex.Civ.App.—Amarillo 1960), *aff'd*, 162 Tex. 84, 344 S.W.2d 863 (1961) (wanton misconduct occurs when the party has conscious knowledge that his conduct will in all probability result in injury).

awareness of crime and a drastic increase in crime in the area before the Assault occurred. Yet Mellon made no effort to determine the extent of criminal activity in the vicinity or to take reasonable steps, or any steps, to secure its Garage or to prevent or deter crime at, or unauthorized entry into, its Garage." Loomis stated he knew of no other garage or facility in the vicinity that would have provided Potter with the same or a comparable opportunity to commit the assault. Relying on evidence that Potter knew about the garage's unrestricted entry and that he drove straight to the garage, Loomis asserted the "unattended and unprotected Garage was a substantial factor in causing the Assault." Based on review of the crime statistics compiled by Pickard and other evidence cited in his report, Loomis opined that "[t]he Garage at the time of the Assault was located in a high crime area. It was foreseeable at the time of the Assault, based on prior criminal acts in the vicinity and the inherently dangerous nature of unattended and unprotected parking garages, that the Assault or a similar event might reasonably result in the absence of reasonable steps or ordinary care to prevent or deter acts of this nature." Under the summary judgment standards of review, in addition to raising fact questions on foreseeability and causation, this evidence is sufficient to raise fact questions on gross negligence.

In short, Mellon failed to establish the absence of a legal duty or causation as a matter of law so as to negate an element of Holder's negligence claims. Indulging all inferences in Holder's favor, we conclude that there is some evidence in the record creating a fact issue as to whether Mellon knew that its unsecured garage was open to criminal activity, which could include serious crimes such as rape or murder, and whether its unattended garage was a substantial factor leading to Holder's injury.

Therefore, because we find fact questions precluding summary judgment exist as to Mellon's liability for common law negligence and gross negligence, we sustain Holder's point of error one on those claims.

### E. Loss of Consortium

▪ Holder also contends Mellon is not entitled to summary judgment on her child's loss of consortium claim. Mellon obtained summary judgment on the consortium claim solely on the ground that Holder did not plead serious, permanent, and disabling physical injuries as a result of the assault. *See Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex.1994); *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex.1990) (limiting recovery of damages for loss of parental consortium to those cases where the parent has sustained "serious, permanent, and disabling" *physical* injuries). Holder pleaded that "[d]efendants have caused serious, permanent, and disabling injuries to Nicholas' mother." There is no allegation of *physical* injury, however.

There is no summary judgment proof on this issue. If Holder's pleading was deficient, Mellon was not entitled to summary judgment without having filed special exceptions and permitting Holder an opportunity to amend. *See In the Interest of B.I.V.*, 870 S.W.2d 12, 13–14 (Tex.1994); *Texas Dept. of Corrections v. Herring*, 513 S.W.2d 6, 10 (Tex.1974). There are no special exceptions directed to the loss of consortium claim in our record. Holder raised Mellon's failure to specially except in her response to Mellon's motion for summary judgment. Therefore, the trial court erred in granting summary judgment on the consortium claim. Without expressing any opinion as to the ultimate viability of this claim, we sustain point of error one with respect to Holder's claim for loss of consortium brought on behalf of her minor son.

### F. Objections to Summary Judgment Proof

In point of error two, Holder complains that the trial court improperly excluded her expert's affidavit. A complaint based on the improper admission or exclusion of evidence is reviewed under an abuse of discretion standard. *Jackson v. Van Winkle*, 660 S.W.2d 807, 810 (Tex.1983). For the exclusion of evidence to constitute reversible error, the complaining party must show: (1) that the trial court committed error; and (2)

that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex.1992); TEX.R.APP. P. 81(b)(1).

### 1. Holder's Expert's Affidavit and Report

 Holder's summary judgment proof included an affidavit from Horace B. Loomis, an expert on security matters. Mellon filed a "global" objection to this affidavit "because that expert report contains opinions that are wholly conclusory." Mellon did not specify which opinions were "wholly conclusory." Mellon raised no objection to the expert's qualifications or the bases for his opinions.

Holder asserts that Mellon's objection does not meet the requirements for specific objections under the rules for summary judgment proof. TEX.R. CIV. P. 166a(f); *Garcia v. John Hancock Variable Life Ins. Co.,* 859 S.W.2d 427, 434 (Tex.App.—San Antonio 1993, writ denied) (holding that objection that affidavit "contains matters of speculation and conclusion" was not sufficiently specific because it was not apparent from the objection which statements were objected to); *see also McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 74 (Tex.1989) (holding rule 52(a) requires a specific objection which enables the trial court to understand the precise grounds so as to make an informed ruling, affording the offering party an opportunity to remedy the defect, if possible). We agree.

 Moreover, Holder argues that her expert's affidavit was admissible and should not have been excluded. While an expert may not testify to his opinion on a pure question of law, he may state an opinion on a mixed question of law and fact. *Lyondell Petrochem. Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 554 (Tex.App.—Houston [1st Dist.] 1994, writ denied). For the opinion to be admissible, the expert must articulate the underlying factual basis of his conclusion. *Id; see also Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996). Loomis gave the factual bases for his conclusions. Expert testimony is admissible on the issues of negligence and proximate cause, including the

foreseeability of criminal conduct arising from prior criminal acts. *Id.; Ronk,* 711 S.W.2d at 419. Because Texas courts usually rely upon expert testimony about the foreseeability of criminal conduct in similar cases, the exclusion of Loomis's affidavit in this case was harmful. *Compare Kendrick,* 846 S.W.2d at 458 (security expert's testimony raised fact question as to whether criminal attack was foreseeable) *with Ronk,* 711 S.W.2d at 419 (no fact question on foreseeability raised in the absence of expert testimony).

We conclude that the trial court abused its discretion in excluding Holder's expert's affidavit entirely, and that this exclusion was harmful. We sustain point of error two.

### 2. Holder's Proof

In Mellon's fifth reply point, it complains that the trial court should have sustained its objections to Holder's summary judgment proof.

 Mellon objected to hearsay statements contained in Holder's affidavit of what Potter allegedly told Holder. The primary objection is to Potter's statement that Mellon's garage was his "sleeping spot." These statements were admissible as statements against interest under TEX.R. CIV. EVID. 803(24). *See Washington v. McMillan,* 898 S.W.2d 392, 397 n. 5 (Tex.App.—San Antonio 1995, no writ). Moreover, any error from the trial court's consideration of Potter's statements would be harmless. The court could infer that Potter was familiar with the garage's unattended status from the evidence that Potter drove straight to the garage. *See Nixon,* 690 S.W.2d at 549 (evidence that assailant took victim "directly to a vacant apartment" permitted inference that the assailant was "acutely aware" of the vacant unit's existence and that it was an easily accessible place in which to perpetrate the assault).

 In addition, Mellon complains that the trial court should have sustained its objection to the affidavit of Richard Pickard because the affidavit failed to establish his competency to testify about crime statistics in the area as required by the rules of evi-

dence. *See* TEX.R. CIV. EVID. 702. Pickard's affidavit recites that he is a principal in Crime Search, Inc., which prepares summary reports using records of the Houston Police Department. There are no other qualifications given.

The same standards for the admissibility of evidence apply in a summary judgment proceeding that are applicable to a regular trial. *United Blood Services v. Longoria*, 938 S.W.2d 29, 30 (Tex.1997). Rule 166a(f) requires that in summary judgment proceedings, supporting and opposing affidavits "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX.R. CIV. P. 166a(f). When a party relies on expert testimony, this requirement includes proof of the expert's qualifications. *Longoria*, 938 S.W.2d at 30.

Whether a witness is qualified to offer expert testimony is a matter committed to the trial court's discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). The trial court must determine if the putative expert has "knowledge, skill, experience, training, or education" that would "assist the trier of fact." TEX.R. CIV. EVID. 702. The burden of establishing an expert's qualifications is on the offering party. *Broders*, 924 S.W.2d at 151.

A close examination of Pickard's affidavit and accompanying report reveals that Pickard did not provide expert opinion testimony. Instead, he merely provided a summary of police crime statistics taken from police reports. Data compilations from public agencies are exceptions to the hearsay rule. TEX.R. CIV. EVID. 803(8). This exception applies, however, when the compilation is prepared by public officials or employees under their supervision in performance of their official duties. *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 676 (Tex.App.—Texarkana 1991, writ denied).

Mellon did not object that Pickard's data was not properly authenticated. In the absence of a proper objection, we cannot say the trial court abused its discretion in considering Pickard's report.

## III. The City's Liability under the Tort Claims Act

In her third point of error, Holder asserts the trial court erred in granting the City's motion to dismiss for lack of jurisdiction. Holder alleged the City was negligent in hiring Potter, retaining him, entrusting him with a badge and a police car, and in monitoring his activities and failing to discover his personal and emotional problems. Based on these claims, Holder contends the City's immunity from liability is waived under the Texas Tort Claims Act ("TTCA"). TEX. CIV. PRAC. & REM.CODE ANN. § 101.001–.009 (Vernon 1986 & Supp.1997).

### A. Standard of Review

A trial court's determination of its subject matter jurisdiction is a question of law. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993). The trial court determines the issue of subject matter jurisdiction solely by the allegations in the plaintiff's pleadings, and the allegations must be taken as true. *Id.* A plaintiff bears the burden of alleging facts affirmatively showing that the trial court had subject matter jurisdiction. *Id.* In our review, we construe the pleadings in favor of the pleader. *Id.*

### B. Sovereign Immunity

Sovereign immunity has two components—immunity from suit and immunity from liability. *Missouri Pac. R.R. Co. v. Brownsville Navigation Dist.*, 453 S.W.2d 812, 813 (Tex.1970); *Green Int'l, Inc. v. State*, 877 S.W.2d 428, 432 (Tex.App.—Austin 1994, writ dism'd). Sovereign immunity from suit bars suits against units of state government unless express consent has been given. *Green Int'l*, 877 S.W.2d at 432; *Liberty Mut. Ins. Co. v. Sharp*, 874 S.W.2d 736, 738 (Tex. App.—Austin 1994, writ denied). A party suing a governmental entity protected by sovereign immunity must allege consent to suit either by reference to statute or express legislative permission. *Missouri Pac.*, 453 S.W.2d at 814. Unless there is a pleading of consent, the trial court has no jurisdiction to hear the case. *Id.*

A city is immune from liability for its governmental actions, unless that immunity is waived. *City of LaPorte v. Barfield,* 898 S.W.2d 288, 291 (Tex.1995). Police protection is a governmental function. TEX. CIV. PRAC. & REM.CODE ANN. § 101.0215(a)(1) (Vernon Supp.1997). The hiring and firing of city employees and the operation of a police department are also governmental functions. *Barfield,* 898 S.W.2d at 291; *City of Dallas v. Moreau,* 718 S.W.2d 776, 779 (Tex.App.— Corpus Christi 1986, writ ref'd n.r.e.). Therefore, the City is immune from liability unless the legislature has waived its immunity by clear and unambiguous language. *See Barfield,* 898 S.W.2d at 291 (citing *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980)).

Section 101.021 of the TTCA sets out the provisions for waiver of governmental immunity, and provides that a governmental unit is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986).

Holder contends that the City is negligent in failing to properly supervise or monitor Potter's use of the City's police car, which qualifies as "tangible personal property" under subsection (2) of the TTCA.[10] Holder argues her claim is not predicated on the City's vicarious liability for Potter's intentional acts. Instead, her claim arises from the City's negligent supervision and monitoring of Potter and his use of its police car. Holder contends Potter used the City's car to stop Holder and that he committed the assault in the car. Even though Potter acted intentionally, Holder claims the City's dispatchers responsible for supervising and monitoring Potter were negligent.

The TTCA does not apply to a claim "arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities." TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2) (Vernon 1986). Thus, the City claims immunity is not waived for Potter's intentional assault of Holder. However, even though an intentional tort is barred by governmental immunity, an injured party may still pursue a claim for simple negligence arising out of the same facts. *Jefferson County v. Sterk,* 830 S.W.2d 260, 261 (Tex.App.—Beaumont 1992, writ denied).

In *Delaney v. University of Houston,* the Texas Supreme Court recognized that negligence claims may not be barred, even though an intentional tort occurred. 835 S.W.2d 56 (Tex.1992). In *Delaney,* a student was raped in her university dormitory room and she sued the university for negligence. The supreme court held that the victim's negligence action against the university did not fall within the intentional tort exception to the waiver of governmental immunity. *Id.* at 60. The court rejected the argument that all of the plaintiff's claims were barred by section 101.057(2) of the TTCA because they arose out of her rape. *Id.* at 59. The court wrote that "intentional conduct intervening between a negligent act and the result does not always vitiate liability for the negligence." *Id.* at 60. The court interpreted section 101.057(2) as requiring that the tortfeasor whose conduct is the subject of the complaint must be a government employee before an exception to the TTCA's waiver of immunity applies. *Id.* The court held that the victim's action against the university was not barred

---

10. In her petition, Holder alleged the City waived its immunity under both subsections (1) and (2) of the TTCA. On appeal, she makes no argument in support of waiver under subsection (1). Holder also pleaded that the City was liable for Potter's negligence, but she has abandoned that argument on appeal.

because the rapist was not a governmental employee, and the victim's claims for the university's failure to repair her dormitory lock despite repeated requests were distinct from the rape she suffered. *Id.* Applying *Delaney* to the facts of this case, we must conclude that because Potter was a government employee, the exception to the TTCA's waiver of immunity applies to his intentional conduct. Nonetheless, we must consider separately the allegations of negligent supervision by Potter's superiors.

In reaching its decision in *Delaney*, our supreme court relied on an opinion from the United States Supreme Court applying similar language in the Federal Tort Claims Act. In *Sheridan v. United States*, 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988), plaintiffs sued after an intoxicated off-duty serviceman fired several rifle shots into their car. They alleged that government employees were negligent in permitting the serviceman to wander off after finding him intoxicated and in possession of a rifle. The Court held that plaintiffs' claim was not one "arising out of"an assault within the meaning of the federal statute because it arose instead out of the government's alleged negligence in allowing the incident to occur. *Id.* at 401–03, 108 S.Ct. at 2455–56. The Court specifically declined to consider whether negligent hiring, negligent supervision, or negligent training may provide the basis for liability under the federal act for a foreseeable assault or battery by a government employee. *Id.* at 403 n. 8, 108 S.Ct. at 2456 n. 8.

The Texas Supreme Court has indicated that actions for negligent employment and entrustment could provide a basis for liability under the TTCA. In *Young v. City of Dimmitt*, 776 S.W.2d 671 (Tex.App.—Amarillo 1989), *writ denied per curiam*, 787 S.W.2d 50 (Tex.1990), a city police officer attempted to kill himself and drove his car into oncoming traffic. The plaintiffs sued the city alleging it negligently employed him and negligently entrusted a police car to him. The trial court dismissed the plaintiffs' claim and the court

of appeals affirmed, concluding that the officer's intentional tortious action precluded application of the TTCA, notwithstanding the allegations of negligent hiring, retention and entrustment. *Id.* at 673. The supreme court disapproved this statement by the court of appeals and found that the petitioners' negligent employment and entrustment claims arose out of the alleged negligence of the city employees supervising the officer, not out of the officer's intentional tort. 787 S.W.2d at 51. Nevertheless, the court found no error requiring reversal of the court of appeals' judgment and denied application for writ of error. *Id.*[11]

Holder argues that this case is analogous to *Smith v. University of Texas*, 664 S.W.2d 180 (Tex.App.—Austin 1984, writ ref'd n.r.e.). In *Smith*, the plaintiff was a volunteer responsible for marking distances in a shot-put competition at UT's Memorial Stadium. The plaintiff was injured when a shot hit him in the head, and he sued the university for negligently supervising the event. The court ruled that the plaintiff stated a proper claim under the TTCA because he alleged UT negligently supervised both the use of real property (the shot-put area at Memorial Stadium) and personal property (the shot), and fact questions precluded summary judgment on this claim. *Id.* at 187–88.

The use of the shot in *Smith* caused the injury to the plaintiff, whereas in this case, the patrol car did not cause the plaintiff's injuries. The City also argues that in *Smith*, the athlete may have thrown the shot *intentionally*, but he did not commit an *intentional tort* as the officer did in this case. More importantly, while it was foreseeable that an injury from a thrown shot could occur at a negligently supervised track meet, no facts are alleged in the petition in this case that would make it foreseeable that improper supervision of Potter would lead to a sexual assault in his patrol car. *See Hein v. Harris County*, 557 S.W.2d 366, 369 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.)

---

**11.** Treating this denial of writ as an affirmance, the Tyler Court of Appeals relied on *Young* to conclude that a negligent entrustment cause of action against a City for an officer's use of a patrol car is not a cause of action included in the TTCA's limited waiver of immunity. *Waldon v. City of Longview*, 855 S.W.2d 875, 880 (Tex. App.—Tyler 1993, no writ). We decline to follow *Waldon*.

("To infer that but for the negligence of the supervisors plaintiff would not have been [injured] would be pure speculation.").

The critical inquiry to determine applicability of the TTCA in this case is the nexus between the use of the property and the alleged negligent conduct causing the injury. The Texas Supreme Court has held:

> the proximate cause of the damages for death or personal injury must be the negligence or wrongful act of the officer or employee acting within the scope of his employment or office. The negligent conduct, however, must involve "some condition or some use" of tangible property under circumstances where there would be private liability.

*Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex.1983). More recently, the court has stated the TTCA "requires the property's condition or use to *cause* the injury." *Kassen v. Hatley,* 887 S.W.2d 4, 14 (Tex. 1994) (emphasis added). The plaintiff must allege an injury arising from the use of the property. *Id.*

The City argues that Holder has not alleged a sufficient relationship between her injury and the use of tangible personal property, the police car, to bring this claim within the TTCA's waiver of immunity. Holder attempts to create a nexus between the car and the alleged negligence of Potter's supervisors, even though her injury was caused by an intentional tort. A similar argument was rejected in *McCord v. Memorial Medical Center Hosp.,* 750 S.W.2d 362 (Tex.App.—Corpus Christi 1988, no writ).

In *McCord,* the plaintiff was assaulted by a hospital security guard using a nightstick. The plaintiff sued, alleging among other claims that the hospital was negligent in supervising the guard. The guard's use of the nightstick was the use of tangible property within the TTCA, according to the plaintiff. The trial court granted summary judgment in favor of the hospital, and the court of appeals affirmed. The court of appeals reasoned that since the use of the nightstick against the appellant was committed by the security guard in the course of an intentional tort, the appellant's claim was precluded by section 101.057(2) of the TTCA. *Id.* at 363.

Here, Potter used his patrol car during the commission of an intentional tort.

This case is also analogous to *Townsend v. Memorial Medical Center,* 529 S.W.2d 264 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.). In *Townsend,* the plaintiff sued after being raped in a county hospital elevator by an orderly. She alleged the hospital failed to maintain adequate safety procedures and the hospital's administrator failed to properly supervise hospital personnel. The trial court determined that the plaintiff failed to state a cause of action under the TTCA and dismissed her suit. The court of appeals affirmed, finding that the gist of the plaintiff's complaint was the rape, an intentional tort excluded by the TTCA. *Id.* at 266–67. The *Delaney* court distinguished *Townsend* based on the orderly's status as a government employee. *Delaney,* 835 S.W.2d at 60. In this case, also, the "gist" of the complaint is the rape, and Potter is a government employee.

In *Texas Youth Comm'n v. Ryan,* 889 S.W.2d 340 (Tex.App.—Houston [14th Dist.] 1994, no writ), a victim who was raped, stabbed and beaten by a juvenile sued TYC for negligent supervision of the youth. The victim alleged the misuse of diagnostic tests and evaluation forms to determine the youth's placement caused her injuries. This court relied on *UTMB v. York,* 871 S.W.2d 175, 178–79 (Tex.1994), and held that the use of diagnostic tools were merely recorded ideas and information, not property under the TTCA. *Ryan,* 889 S.W.2d at 344. We further held that these tests fell short of the "required causal nexus" to trigger liability under the TTCA because they were not the "direct devices" which proximately caused the plaintiff's injuries. *Id.* at 344–45.

In this case, the use of the patrol car was not the "direct device" causing Holder's injury, and the "required causal nexus" for liability under the TTCA is missing. Instead, Holder was injured by Potter's intentional assault.

And so, we determine that Holder has not alleged an injury caused by or arising from the use of property under the TTCA. Even after construing the pleadings in favor of

Holder, we hold that she failed to state a claim for which governmental immunity is waived under the TTCA. The trial court properly dismissed Holder's claims against the City. Accordingly, we overrule point of error three.

## IV. Conclusion

In conclusion, we reverse those portions of the summary judgment on Holder's ordinary and gross negligence claims and the loss of consortium claim brought on behalf of Holder's minor child, and we remand those causes to the trial court for further proceedings consistent with this opinion. We affirm the summary judgment on Holder's negligence per se claim, and we affirm the trial court's order dismissing Holder's claim against the City.

HUDSON, Justice, dissenting.

Appellant was kidnapped and sexually assaulted by Calvin Potter, a Houston Police Officer. Although Potter initially encountered his victim on a public street, he transported her to the third floor of Mellon's parking garage where he perpetrated the offense in the interior of his patrol car. The direct, immediate, and primary cause of appellant's injury was Calvin Potter. The majority contends, however, that there is some evidence to show appellant's injury was also caused by Mellon's failure to prevent vehicular traffic from entering its garage during the evening hours. If Potter had not been able to hide his police car inside the confines of the garage, the majority claims appellant might not have been assaulted. Because Mellon breached no duty to appellant and its conduct was not a proximate cause of appellant's injury, I dissent.

The duty owed by a property owner to another person depends upon the status of the injured party. The law assumes that a property owner bears a greater responsibility toward one whom he has invited upon his property than to one whom he has not invited. The status of the injured party, therefore, is determined by the actions of the property owner and his relationship with the injured party. Although appellant entered

the garage in submission to Potter's authority as a police officer, she entered without any right, lawful authority, express or implied invitation, consent, or acquiescence by Mellon. She was, therefore, a trespasser. *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 933 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). Mellon's only duty to appellant was not to injure her willfully or wantonly or through gross negligence. *Williams v. Bill's Custom Fit, Inc.*, 821 S.W.2d 432, 433 (Tex.App.—Waco 1991, no writ). To find appellant was not a trespasser because her entry upon the property was involuntary would permit a third party, *i.e.*, Potter, who is not under the control of the property owner, to alter the status of the injured party.

The majority concludes that Holder was a gratuitous licensee because Mellon failed to erect a barrier across the entrance of its garage and thereby acquiesced in her entry onto the property. However, a licensee is a person who is privileged to enter and remain on the premises by the express or implied permission of the owner. *Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 163 (Tex. App.—Waco 1995, no writ). No such express or implied permission is presented here. Unlike a parking lot, where a pedestrian might be tempted to cut across the property to shorten his journey to a particular destination, a multi-level parking garage offers no "short cuts." While it may have been foreseeable that vagrants would seek shelter in such an edifice, there was no reason to anticipate vehicular traffic in the structure during non-business hours.

However, even if Mellon should have anticipated that cars would enter and park within the garage during non-business hours, and even if appellant was a gratuitous licensee by virtue of Mellon's acquiescence, no duty to appellant was breached. The duty owed a licensee is not to injure willfully, wantonly, or through gross negligence and to warn of or make safe dangerous conditions actually known. *Lower Neches Valley Authority v. Murphy*, 536 S.W.2d 561 (Tex.1976); *State v. Tennison*, 509 S.W.2d 560 (Tex.1974).[1] The

1. *In contrast, the standard of conduct required* of a premises occupier toward his invitees is the

majority contends Mellon had a duty to make safe a known "dangerous condition," *i.e.*, the possibility of criminal misconduct.

Unfortunately, criminal activity is pervasive in our society and there is scarcely any refuge from it. In this sense it is foreseeable that crime may occur any place and at any time. Some property, by virtue of its location in depressed areas of high crime, is more likely to be the site of criminal activity. However, a property owner cannot transport his real estate to a more desirable part of the city, and the mere location of property should not be regarded as a "dangerous condition." I believe property becomes "dangerous" in the context of criminal activity only when it possesses some special quality which fosters or attracts criminal activity that makes it more dangerous than other property in the immediate area.

Here, Mellon's property was not a particularly attractive site for criminal activity. Crimes against persons such as homicide, robbery, kidnapping, and assault do not occur where people are not present. The first prerequisite for a predatory criminal act is a victim, and while the garage was vacant, no dangerous condition could endure. Indeed, in this case, the criminal episode began not in the garage, but upon the street. Further, in cases of sexual assault, the offense can be perpetrated in any darkened or reasonably private area where the perpetrator will not be discovered—many, if not most, occur in the victim's own home. In this respect, Mellon's parking garage was not inherently dangerous. What made the garage attractive in

this instance was that Potter could not abandon his patrol car, even temporarily, without attracting the suspicion of other officers. He needed not so much a place to perpetrate the offense, but a place to conceal his vehicle while he carried out the assault.

Mellon might have reasonably anticipated that its garage would attract vagrants during the evening hours. It was even foreseeable that it might be an attractive site for substance abuse and vandalism. However, only under the bizarre and unusual facts of this case could Mellon have anticipated that its facility would be an attractive edifice for crimes perpetrated against a person during non-business hours. Because Mellon could not have reasonably foreseen the unusual circumstances which would make its garage an attractive site for criminal activity, it had no duty to make the condition safe by blocking vehicular traffic.

Moreover, even if Mellon should have closed the entrance to its garage to prevent *any* criminal conduct from occurring on its premises, I do not believe this failure or omission can be deemed a proximate cause of appellant's injury. At some point in the causal chain, conduct will become too remotely connected to be considered a cause in fact. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995). Here, the record contains some proof that "but for" Mellon's failure to exclude vehicular traffic from its garage, no assault would have occurred because there was no other nearby location which could have provided the necessary concealment for Potter's patrol car.[2] While this

ordinary care that a reasonably prudent person would exercise under all pertinent circumstances. *Corbin v. Safeway Stores*, 648 S.W.2d 292 (Tex.1983).

2. The "but for" test is, I believe, valid only when used as a standard of exclusion, not inclusion. For example, where the plaintiff stopped to fix a malfunctioning sign and was struck by a passing vehicle, the sign manufacturer was not liable for the injury even though the plaintiff would not have been injured but for the defective sign. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470 (Tex. 1991).

In *Wheaton Van Lines, Inc. v. Mason*, 925 S.W.2d 722 (Tex.App.—Fort Worth 1996, writ denied) the defendant made certain misrepresentations which caused the plaintiff to employ a particular moving company. While moving the

plaintiff's property, one of the workmen stole a box of music compact discs. After the moving company had terminated the workman on account of the theft, the workman went to the plaintiff's home and assaulted him. Although the assault would never have occurred "but for" defendant's original misrepresentations, the connection between the misrepresentation and the assault was too remote to constitute a legal cause.

Moreover, while the defendant in *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942 (Tex.App.—Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex.1995) may have incorrectly represented to the plaintiffs that its volunteer workers had been investigated, this misrepresentation was not the legal cause of the sexual abuse perpetrated by one of the volunteer workers on the victim/plaintiff.

provides some nexus in the philosophical sense, legal cause is not established if the defendant's conduct does no more than furnish the condition that made the plaintiff's injury possible. *Id.*, at 776.

The majority distinguishes *Union Pump* by noting that it was not a case of premises liability. I fail to see how this qualifies as a distinguishing factor. "Negligent activity" and "premises liability" are both negligence-based theories of liability.[3] Both theories rest upon the premise that the defendant should pay because he is morally responsible for the injury. In fact, the whole concept of liability, both civil and criminal, is derived from a common passion for vengeance to correct a moral outrage.[4] This is why the law imposes a requirement of foreseeability—there can be no blame associated with a sequence of events which a prudent and morally responsible person could not have reasonably foreseen.

It is not surprising, therefore, that the same definition of proximate cause is used in cases of negligent activity *and* premises liability.[5] There may be more than one legal cause for an injury, and cause in fact is certainly not synonymous with sole cause.

Nevertheless, cause in fact means that the defendant's act or omission was a *substantial factor* in bringing about the injury which would not otherwise have occurred. *Union Pump*, 898 S.W.2d at 775.[6]

The direct and, I believe, superseding cause of appellant's injury in this case was the criminal act of Calvin Potter. While the assault might not have occurred if Potter had been unable to drive his car into the garage, the accessability of Mellon's garage hardly constitutes a cause in fact for appellant's injury except in the most attenuated and philosophical sense.

For these reasons, I respectfully dissent.

Finally, in *Riojas v. Lone Star Gas Co.*, 637 S.W.2d 956 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.) the defendant gas company failed to send a monthly bill to plaintiffs for four months. During this period, the plaintiffs called and repeatedly requested a bill. When the defendant finally sent a bill, it was too large for the plaintiff to pay. Defendant refused to permit installment payments on the bill and terminated service. Plaintiffs were injured by carbon monoxide poisoning when they burned charcoal inside their home. Although plaintiffs would never have been injured "but for" the defendant's negligence in permitting four months of bills to accumulate, this negligence was not the legal cause of plaintiffs injuries.

3. *Ramirez v. H.E. Butt Grocery Co.*, 909 S.W.2d 62, 67 (Tex.App.—Waco 1995, writ denied).

4. This is illustrated in Roman law by the fact that the offended citizen was forced to choose between a civil remedy or a criminal indictment. FLAVIUS JUSTINIAN, THE INSTITUTES OF JUSTINIAN 171–72 (J.B. Moyle trans., 5th ed.1913). *See also* O.W. HOLMES, JR., THE COMMON LAW 2–3 (1881). While the desire for revenge can be readily appreciated in the context of intentional torts, it is less obvious when applied to accidental injuries arising in connection with inanimate objects. There arose in antiquity, however, the notion that liability

attaches to the body doing damage whether it be animate or inanimate, and Holmes observed that even a civilized man will kick a door when it pinches his finger. HOLMES, *supra* at 11–12. To satisfy the desire for vengeance, the object "responsible" for the injury was at first surrendered to the plaintiff. In later times, the owner of the offending object was extended the privilege of making a substitutionary payment of money as a way of buying off the vengeance and permitting him to retain the property. Eventually, "[w]hat had been the privilege of buying off vengeance by agreement, of paying the damage instead of surrendering the body of the offender, no doubt became a general custom." HOLMES, *supra* at 15.

5. The two elements of proximate cause are cause in fact and forseeability. *Union Pump*, 898 S.W.2d at 775; *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 549 (Tex.1985).

6. "Through all the diverse theories of proximate cause runs a common thread; all agree that defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is liability. This notion is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence or nonexistence of a causal relation as laymen would view it." 2 FOWLER V. HARPER AND FLEMING JAMES, JR., THE LAW OF TORTS § 20.2 at 1110 (1956).